UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| In re: | ) | Chapter 13 |
| | ) | |
| SCOTT M. CARLSEN, SR., | ) | No. 12 B 18047 |
| | ) | |
| Debtor. | ) | |

## MEMORANDUM OPINION

This matter is before the court for ruling after an evidentiary hearing on the objection of debtor Scott M. Carlsen, Sr. ("Scott") to the claim of Catherine M. Carlsen ("Catherine"), his ex-wife. For the following reasons – which constitute the court's findings of fact and conclusions of law pursuant to Bankruptcy Rules 7052 and 9014(c), Fed. R. Bankr. P. 7052, 9014(c) – the objection will be sustained and the claim disallowed in its entirety.

### 1. Jurisdiction

The court has subject matter jurisdiction over this case pursuant to 28 U.S.C. § 1334(a) and the district court's Internal Operating Procedure 15(a). The allowance or disallowance of a claim against the bankruptcy estate is a core proceeding pursuant to 28 U.S.C. §§ 157(b)(2)(A) and (B).

### 2. Facts

The evidence at the hearing showed the following. Scott and Catherine were married in 1999. (C. Ex. 1 at 1-2; Tr. at 39).[1] At the time of their marriage, they had a son born in 1995. (C. Ex. 1 at 1-2; Tr. at 39). Catherine also had two daughters who are now over 18 but were

---

[1] The hearing transcript is cited in this opinion as "Tr. at ___." Scott's exhibits are cited as "S. Ex. ___." Catherine's exhibits are cited as "C. Ex. ___."

minors at all times relevant here. (Tr. at 77).

Scott and Catherine owned a residence at 626 Navajo Street, Round Lake Heights, Illinois, where they lived during their marriage. (Tr. at 24-26, 54; C. Ex. 2 at 29).[2/] The property was encumbered with first and second mortgages in favor of TCF National Bank. (S. Exs. 2-5). Although both Scott and Catherine were listed on the mortgages as mortgagors, only Scott's name appeared on the note for the first mortgage. (S. Exs. 2-3, 5). Only he was a borrower, and only he was obligated on the note. (Tr. at 36, 54-55, 59). Scott was also the sole borrower on the second mortgage. (S. Exs. 4-5; Tr. at 55).

In 2005, Catherine filed a dissolution of marriage action in Illinois state court. (*See* C. Ex. 1). The parties ultimately reached a negotiated Marital Settlement Agreement ("MSA"), and in 2006 the state court entered a judgment of dissolution of marriage that incorporated the MSA. (*Id.*).

Two parts of the MSA, paragraphs 3.A and 11, are important here. Paragraph 3.A concerned "Child Support." (C. Ex. 1 at 4). Under paragraph 3.A, Scott was obligated to pay $205.95 per week in child support, representing 20% of his income. (*Id.*). Child support payments, however, would not commence until "the first week following the sale of the marital residence." (*Id.*).

Paragraph 11, in turn, was headed "Division of Marital Home." (C. Ex. 1 at 9). Paragraph 11 recited that Scott and Catherine had placed the marital residence on Navajo Street for sale and would market it until sold. (*Id.*). At closing, proceeds from the sale would be applied first to the mortgage and a variety of other debts, all defined as "closing costs." (*Id.*).

---

[2/]    Whether Catherine co-owned the property is not entirely clear: she testified both that she did (Tr. at 54, 109), and that she did not (*id.* at 57). But the ownership question is not material to the outcome on Scott's objection.

After payment of these closing costs, Catherine would be entitled to receive $12,200 from the sale proceeds; any remaining proceeds would be divided equally. (*Id.*). But until the sale closed, paragraph 11 said, Scott would be responsible for "costs associated with maintaining the Property until closing," including "real estate taxes, mortgage payments, insurance payments, and utility payments." (*Id.*). These payments were to be made directly to TCF, the taxing authority, the insurance company, and the utility companies; they were not payable directly to Catherine. (Tr. at 64).

In 2006 when the divorce judgment was entered, Catherine was attending school to become a massage therapist and either not working or only working part-time (the evidence conflicted). (Tr. at 75-76, 78, 80, 131; C. Ex. 3 at 2). The MSA therefore required Scott to pay Catherine a single year of maintenance. (*Id.* at 66). Soon after entry of the judgment, however, Catherine began working for a manufacturing company where she has continued to work for the past seven years. (*Id.* at 76, 79).

Scott testified that the parties expected the marital residence to sell within a year (Tr. at 106, 125), and Catherine admitted she knew the residence might sell quickly, perhaps within several months (*id.* at 54). Unfortunately, it did not. (*Id.* at 106). The price was lowered many times, and still the residence did not sell. (*Id.* at 106-07). Then, two years after the divorce, the real estate market crashed, and the value of the residence declined: Scott testified without contradiction that after the crash the residence was worth less than the mortgages on it. (*Id.* at 107). In March 2011, almost five years after he and Catherine divorced, Scott asked TCF to agree to a short sale. (*Id.*). The bank refused. (*Id.*).

The following month, April 2011, Scott told Catherine he could no longer afford to make the mortgage payments, and he stopped making them. (Tr. at 119-20). It appears he stopped

-3-

paying the real estate taxes as well. (*See* C. Ex. 2 at 28). In October 2011, TCF filed an action to foreclose its first mortgage on the Navajo Street property. (Tr. at 31, 85-86; *see* C. Ex. 2 at 22).

Some months later, in March 2012, Catherine moved in the state court to have Scott held in contempt because he had failed to pay the mortgage, real estate taxes, and insurance as the MSA required. (Tr. at 45-47, 86, 94; *see* C. Ex. 2). A rule to show cause was issued. (Tr. at 47). On May 1, 2012, however, before the state court could hold a hearing on the return of the rule, Scott filed a chapter 13 bankruptcy case. (*Id.* at 86-87, 94).

TCF then moved in the bankruptcy case for relief from the automatic stay to proceed with the mortgage foreclosure action. (Dkt. No. 12). The motion was granted. (Dkt. No. 16). At some point thereafter, a judgment of foreclosure and sale must have been entered in the state court, because there is no dispute that the Navajo Street property was sold at a foreclosure sale in September 2012. (Tr. at 74). There were no net proceeds from the sale to pay the costs described in paragraph 11 of the MSA. (*Id.*). After the sale, Scott began making child support payments as paragraph 3.A required. (Tr. at 126).

From the entry of the judgment of dissolution in May 2006 until the foreclosure sale in September 2012, Catherine lived in the marital residence with her children. (Tr. at 24-26, 124).[3/] Although she has since moved away, Catherine was not only living in the marital residence when the sale took place but was still living there in October and November 2012. (*Id.* at 28, 38, 50, 124).

From the entry of the judgment through the date of sale, Catherine made no payments on

---

[3/] Scott had moved out of the residence even before the divorce. (Tr. at 93). Both Scott and Catherine assume that the MSA gave Catherine possession of the marital residence until it was sold (*see id.* at 41, 54, 92-93), and that was certainly how the parties conducted themselves. But in fact the MSA did not award possession of the residence to either one. Possession was never mentioned, only the disposition of the anticipated sale proceeds.

either the first or second mortgage. (*Id.* at 60). Nor did she ever pay the real estate taxes. (*Id.* at 60-61). Catherine testified that she had made some utility payments but only in October or November 2012, after the sale. (*Id.*). Otherwise, Scott said, he had paid for utilities. (*Id.* at 110). None of the mortgage payments, real estate tax payments, or utility payments that Scott made were ever made directly to Catherine herself. (*Id.* at 64-65).

Catherine filed a timely unsecured claim for $24,881 in Scott's bankruptcy case, the proof of claim stating as its basis "domestic support obligation and property settlement." (C. Ex. 5). The form indicated that $13,798.65 of the claim amount was a priority claim, leaving $11,082.35 as the general unsecured portion. (*Id.*). Attached to the proof of claim form was a copy of the MSA along with an affidavit from Catherine. (*Id.*). The affidavit asserted that the priority portion of the claim represented "child support owed from April 1, 2011 through July 11, 2012," with $12,200 a property settlement payable presumably under paragraph 11 of the MSA. (*Id.*).[4/]

Scott objected to the claim on the ground that he owed no child support. (Dkt. No. 37). Catherine's response to the objection shed some light on the precise nature of her claim. (Dkt. No. 40). The claim, it turned out, was not for "child support" as such but rather for mortgage payments owed under paragraph 11 of the MSA and not paid (real estate taxes, insurance, and utility payments were not mentioned). Catherine also asserted for the first time in her response that she was owed attorney's fees either under paragraph 22 of the MSA or because Scott had been held in contempt in the state court.

---

[4/] The affidavit did not explain why the property settlement was $12,200 when the unsecured portion listed in the proof of claim was only $11,082.35. And that was not the only peculiarity in the proof of claim. The monthly payment on the first mortgage was $903.14, and the annual real estate tax payment was $4,163. Because Scott failed to make mortgage payments for thirteen months and failed to make at least one annual real estate tax payment, the priority portion of the claim should have been $15,903.82. Yet the priority portion listed in the proof of claim was only $13,798.65. The evidence at the hearing failed to explain these discrepancies.

On February 1, 2013, the court announced several preliminary conclusions about Catherine's claim based on the claim objection and response, among them (1) that Catherine had no claim in the bankruptcy case for unpaid child support accruing before the sale of the marital residence, and (2) that it appeared she had no claim for attorney's fees either under paragraph 22 of the MSA or because Scott had been held in contempt for failure to pay child support. The court also concluded preliminarily that Catherine did have a claim for the unpaid mortgage payments, but that it was unclear whether the claim was entitled to priority as a "domestic support obligation." 11 U.S.C. § 507(a)(1). Since no firm conclusions on these points were possible, the matter was set for an evidentiary hearing.

At the hearing, Catherine's counsel clarified the nature of the claim. As the proof of claim suggested, and despite what Catherine's response (and for that matter the proof of claim itself) had said, the claim had two components: a priority portion consisting of mortgage payments, real estate taxes, and utility bills due under paragraph 11 of the MSA and unpaid, and a non-priority portion consisting of the $12,200 payable under the same paragraph from the sale proceeds. (Tr. at 4-5).

### 3. Discussion

Scott's objection to Catherine's claim will be sustained, and the claim will be disallowed in its entirety. Catherine has no claim either for the $12,200 or for any unpaid mortgage payments, real estate taxes, or utility payments.[5]

---

[5] In reaching this decision, the court reconsiders its original view that Catherine has a claim for the unpaid mortgage payments and real estate taxes. A court can always reconsider and modify any non-final order before entering a final one. *Kapco Mfg. Co. v. C & O Enters., Inc.*, 773 F.2d 151, 154 (7th Cir. 1985); *Johnson v. O'Donnell*, No. 01-C-0257-C, 2002 WL 32349189, at *2 (W.D. Wis. Sept. 12, 2002). Here, no order was even entered. The court merely notified the parties of several tentative conclusions as a prelude to the evidentiary hearing.

### a. The Burdens of Proof and Going Forward

Both the burden of proof to establish her claim and the burden of going forward at the hearing fell on Catherine. Although the ultimate burden of proof always belongs to the claimant, *see In re Kreisler*, 407 B.R. 321, 325 (Bankr. N.D. Ill. 2009), the burden of going forward at the hearing on a claim objection typically lies with the debtor. That is because a proof of claim is itself prima facie evidence of the claim's validity and amount, Fed. R. Bankr. P. 3001(f), and the claim is allowed unless a party in interests objects, 11 U.S.C. § 502(a). The objecting party therefore has the initial burden to produce evidence tending to rebut the claim. *In re Hood*, 449 F. App'x 507, 509-10 (7th Cir. 2011); *Kreisler*, 407 B.R. at 325.

But that scheme only applies when the proof of claim is "executed and filed in accordance with" the rules. Fed. R. Bankr. P. 3001(f). To comply with the rules, the proof of claim must conform substantially to Official Form 10. Fed. R. Bankr. P. 3001(a). The official form requires a claimant to state the "basis" for the claim, and the instructions explain that the claimant must "state the type of debt or how it was incurred." Off. Bankr. Form 10. Courts have explained that a proof of claim must be sufficiently specific to give notice of the claim. *See generally In re marchFirst, Inc.*, 431 B.R. 436, 443 (Bankr. N.D. Ill. 2010). When an adequate factual basis is not provided, the proof of claim is not prima facie evidence of the claim's validity or amount, and the creditor must shoulder the burden of going forward as well as the burden of proof. *In re Stancil*, No. 01-02220, 2005 WL 3036647, at *39-40 (Bankr. D.D.C. Nov. 7, 2005).

Catherine's proof of claim failed to provide adequate notice of the nature of her claim. The form stated an overall claim amount, gave as the basis for that amount "domestic support obligation and property settlement," and then indicated that a portion of the amount was a priority unsecured claim for "[a]limony, maintenance, or support owed to a spouse, former

spouse or child." Attached to the form was a copy of the MSA and Catherine's affidavit asserting only that Scott owed her $12,200 as a property settlement and $13,798.65 as "child support." Nothing identified the $12,200 as the sum mentioned in paragraph 11 of the MSA, and nothing suggested that Catherine was asserting a right to unpaid mortgage payments, real estate taxes, or utility payments. The dollar figures supplied in the affidavit also did not equal the overall amount on the proof of claim form. Because her proof of claim lacked the clarity and specificity necessary to put Scott on notice, the burden of going forward as well as the burden of proof belonged to Catherine. (Tr. at 18-19).

### b. The Meaning of "Claim"

To meet those burdens, Catherine had to demonstrate that she had a "claim" as the Bankruptcy Code defines the term. Under section 101(5)(A) of the Code, a creditor has a "claim" as long as he has a "right to payment." 11 U.S.C. § 101(5)(A). This definition was meant to be the "broadest available," *Johnson v. Home State Bank*, 501 U.S. 78, 83 (1991), and so includes any right to payment, whether "reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured," 11 U.S.C. § 101(5)(A).[6] But there must still be some "right to payment," meaning "nothing more nor less than an enforceable obligation." *Pennsylvania Dept. of Public Welfare v. Davenport*, 495 U.S. 552, 559 (1990). And the obligation must usually be enforceable under state law, since state law governs most claims in bankruptcy cases. *Travelers Cas. & Sur. Co. v. Pacific Gas & Elec. Co.*, 549 U.S. 443, 451 (2007).

---

[6] Section 101(5)(B) adds that a "claim" also includes a "right to an equitable remedy for breach of performance if such breach gives rise to a right to payment . . . ." 11 U.S.C. § 101(5)(B). Catherine's claim does not assert a right to any equitable remedy.

-8-

### c. The $12,200 From the Sale Proceeds

Catherine failed to prove she had a right to payment of the $12,200 under paragraph 11 of the MSA. Paragraph 11 entitled Catherine to that sum from the "net proceeds" of the sale of the marital residence, after payment of various "closing costs" (as defined in the MSA). Only if there were in fact net proceeds, then, would Catherine be paid the $12,200 (or anything at all, since she was presumably entitled to be paid to the extent there were any net proceeds beyond the closing costs). It was undisputed, however, that the Navajo Street property was worth less than the two mortgage loans encumbering it. As a consequence, there were no net proceeds from the sale. Not even the "closing costs" were paid. Therefore, Catherine has no right to be paid the $12,200 and has no claim. *See* 11 U.S.C. § 101(5)(A).

True, a "claim" can be "contingent," *id.* – the right to payment can depend upon an "event that may never happen or upon a condition which may never be fulfilled," *In re Orseno*, 390 B.R. 350, 354 (Bankr. N.D. Ill. 2008) (internal quotation omitted); *see also Kreisler*, 407 B.R. at 325-26. On the petition date, then, Catherine had a contingent claim for the $12,200 because the sale had not yet taken place. But later events made the occurrence of the contingency – not just a sale but net proceeds from the sale – impossible: the sale took place, and it produced no net proceeds. When the contingency on which a claim depends can no longer occur, the creditor no longer has a contingent claim. *In re Chateaugay Corp.*, 89 F.3d 942, 951 (2d Cir. 1996) ("Contingent claims . . . include claims that may reasonably occur in the future, not claims that could have occurred but in fact did not and cannot now occur."); *Foothill Capital Corp. v. Official Unsecured Creditors' Comm. of Midcom Commc'ns, Inc.*, 246 B.R. 296, 305 (E.D. Mich. 2000).

Because Catherine did not prove her right to be paid the $12,200 from the sale of the marital residence, she has no claim for that amount. That portion of her claim will be disallowed.

#### d. The Mortgage Payments, Real Estate Taxes, and Utilities

Catherine also failed to prove her claim for the unpaid mortgage payments and real estate taxes (the evidence showed Scott had made all the utility payments due pre-petition).

Catherine had no right to the mortgage payments or the real estate taxes because those payments were not owed to her. The mortgage payments were owed to TCF, and the real estate taxes were owed to Lake County, Illinois. Under Illinois law, only the bank and the county could enforce Scott's obligations to make those payments. Nor did the evidence show that Catherine made any of the payments herself when Scott failed to make them, possibly entitling her to reimbursement. *See In re Marriage of Hopwood*, 378 Ill. App. 3d 746, 749, 882 N.E.2d 205, 207 (5th Dist. 2008) (describing the doctrine of subrogation); *see also Levin v. Greco (In re Greco)*, 397 B.R. 102, 109 (Bankr. N.D. Ill. 2008), *rev'd on other grounds*, 415 B.R. 663 (N.D. Ill. 2009). Catherine simply did not demonstrate any sort of "enforceable obligation" entitling her to the payments. *Davenport*, 495 U.S. at 559. She therefore has no claim.

A substantial body of case law, most of it addressing non-dischargeability under section 523(a)(5), 11 U.S.C. § 523(a)(5), does hold that an ex-spouse's debt arising under a divorce decree can constitute "support" although the debt is owed to a third party. *See Levin v. Greco*, 415 B.R. 663, 666-67 (N.D. Ill. 2009). Some of the decisions concern an ex-spouse's obligation to make mortgage payments. *See, e.g., Harr v. Harr (In re Harr)*, Nos. 97 B 35027, 98 A 169, 2000 WL 1341402, at *6 (Bankr. N.D. Ill. Sept. 18, 2000); *Shevick v. Brodsky (In re Brodsky)*, 239 B.R. 365, 370 (Bankr. N.D. Ill. 1999). Those decisions, however, hold only that the debtor ex-spouse's obligation to make the payments *to the mortgage company* survives the discharge,

not that the non-debtor ex-spouse has a claim in the bankruptcy case for the unmade payments.[7/] Catherine was owed just such an obligation under the MSA, and the obligation was enforceable. But that obligation required Scott to make payments *to TCF*, not to Catherine herself.

It is also true that Scott breached the MSA when he failed to make the payments, conceivably giving Catherine a claim arising from the breach.[8/] Under Illinois law, however, a party asserting a breach of contract must prove damage from the breach. *Harmon v. Gordon*, ___ F.3d ___, ___, 2013 WL 1150204, at *6 (7th Cir. Mar. 21, 2013); *Walker v. Ridgeview Const. Co.*, 316 Ill. App. 3d 592, 596, 736 N.E.2d 1184, 1187 (1st Dist. 2000). Catherine did not show and could not have shown she was damaged. The MSA expressly contemplated that the marital residence would be sold; once it was sold, Catherine admitted, she would have had to move out. (Tr. at 63). Despite the breach, she was able to live there not only until the sale but several months beyond. As Scott rightly notes, Catherine received "the benefit of the bargain." (Dkt. No. 45 at 3). In fact, given the parties' original expectation that the marital residence would sell quickly, perhaps in a matter of months, she got a good bit more than she bargained for. For her now to receive thirteen months of mortgage payments and a year of real estate taxes as well would be a windfall.

Because Catherine did not prove she had any right to the mortgage or real estate tax

---

[7/]    Catherine cites no decision in which a non-debtor ex-spouse was held to have a claim for a debtor ex-spouse's unmade mortgage payments under the circumstances here: the non-debtor ex-spouse was not liable on the note and made no mortgage payments herself after the debtor ex-spouse defaulted. *Cf. In re Westerfield*, 403 B.R. 545, 547-58, 549 (Bankr. E.D. Tenn. 2009) (finding non-debtor ex-spouse had a claim for mortgage payments she made to avoid foreclosure). The court's own research has uncovered no such decision.

[8/]    Although her proof of claim suggests otherwise, at one point during the hearing Catherine testified that she was seeking "to be compensated" for Scott's failure to make the mortgage payments. (*See* Tr. at 42).

-11-

payments, she has no claim for those amounts. That portion of her claim will be disallowed as well.

### 4. Conclusion

For these reasons, the objection of debtor Scott M. Carlsen, Sr. to the claim of Catherine M. Carlsen is sustained. The claim is disallowed in its entirety. A separate order will be entered in accordance with this opinion.

Dated:  March 27, 2013

_____
A. Benjamin Goldgar
United States Bankruptcy Judge